## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 04 2019, 7:17 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Deborah Markisohn
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Benjamin J. Shoptaw
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

Calvin Dshan Baxter,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff.*

September 4, 2019

Court of Appeals Case No.
18A-CR-2879

Appeal from the
Marion Superior Court

The Honorable
Kurt Eisgruber, Judge

Trial Court Cause No.
49G01-1612-MR-46259

**Altice, Judge.**

## Case Summary

Following a jury trial, Calvin Baxter was convicted of murder and Level 4 felony possession of a firearm by a serious violent felon. Baxter appeals his conviction and sentence for murder, raising the following two restated issues:

> I. Did the State present sufficient evidence to convict Baxter of murder?

> II. Is his sentence inappropriate in light of the offense and the character of the offender?

We affirm.

## Facts & Procedural History

On September 7, 2016, Malcolm McDaniel and his friend Kasie Kemper went to Emerson Knoll Apartments, where McDaniel intended to sell drugs to someone who went by the name "40."[1] *Transcript Vol. II* at 43-44, 62. McDaniel was driving a red Ford Escape SUV that belonged to his fiancée, Jazmine Acquaye.

After they parked, a male got in the back seat of the Ford Escape and sat behind McDaniel. Kemper was in the front passenger seat. McDaniel, without turning around, handed a bag of drugs to the man, and the two exchanged words, with the man complaining that McDaniel gave him "ice," meaning

---

[1] In some places in the record, the name appears as "Forty." *See Appellant's Appendix Vol. II* at 20.

methamphetamine, when he wanted "hardware," meaning cocaine. *Id.* at 46. McDaniel responded, "No, that's not what you said last night," to which the man replied, "You're going to have to come off this, bro" and then, according to Kemper, the man "leaned back and started shooting." *Id.* McDaniel grabbed a gun from under his seat and began shooting back. Kemper was "sitting sideways … facing [McDaniel]" and, when the shooting started, she leaned forward into the dash. *Id.* at 48. Kemper heard "a lot" of shots and recalled that "the guy in the back seat was just like shooting wild." *Id.* The man got out of the Escape and ran but Kemper could not see where he went because they were parked next to a large SUV. Kemper tried to call 911 but was disconnected, so she yelled "Call 911" to a man who had come out of his apartment, and he said he had already done so. *Id.* at 49.

[5] The 911 call was received at 7:36 p.m. and officers arrived on the scene at 7:41 p.m., immediately securing the area and calling for an ambulance. Indianapolis Metropolitan Police Department (IMPD) Officer Richard Lavish saw a shoe in the parking lot in proximity to the scene. Another officer stood by the shoe, which was a red Converse tennis shoe, until it was collected as evidence. IMPD Detective Harry Dunn arrived at the scene at 7:59 p.m., was advised by officers about the red shoe, and spoke to Kemper. An ambulance took McDaniel to a hospital, where he later died. Forensic testing revealed that he received seven gunshot wounds to his neck, chest, upper chest, and back.

[6] Meanwhile, at 7:43 p.m., police were dispatched to the 3000 block of N. Colorado Avenue, which is located less than a mile away from the Emerson

Knoll location, on a report of "a person shot." *Id.* at 66. IMPD Officer Timothy Elliott was the first to respond to the Colorado Avenue location, arriving at 7:45 p.m. Officer Elliott encountered a man who had been shot in the leg. He was wearing blood-soaked pants and a red "Chuck Taylor style" tennis shoe on his left foot, but his right shoe was missing. *Id.* at 70. The man identified himself as Baxter and told officers that he was walking down the street and was randomly shot at an unknown location, which Officer Elliott felt "didn't quite make a lot of sense." *Id.* at 72. Officer Elliott was aware that a shooting had just occurred at Emerson Knoll Apartments and the suspect may have left in a purple or dark blue four-door vehicle. After receiving reports at the Colorado Avenue scene that Baxter was dropped off in a four-door car, Officer Elliott contacted officers at the Emerson Knoll scene. Upon doing so, he learned that one red tennis style shoe, for the right foot, was found and possibly had been left behind by the suspect. Because Baxter was wearing one red Chuck Taylor style tennis shoe on his left foot, officers suspected the Colorado Avenue and Emerson Knoll crime scenes may have been connected. Officer Elliott thereafter secured Baxter in handcuffs in the ambulance.

[7] Detective Dunn left the Emerson Knoll scene and arrived at the Colorado Avenue scene at about 8:45 p.m. At that point, Baxter had been transported by ambulance, but the shoe and pants that Baxter had been wearing were left behind by medics. Detective Dunn saw the red tennis shoe and believed it matched the one found at the Emerson Knoll scene.

[8]     Detective Dunn spoke again with Kemper later that evening at IMPD's homicide office, where he showed her a photo array of six possible suspects. Person No. 4 in the array, who was Baxter, had a tattoo on the left side of his face above his eyebrow and he had a small tattoo on the right side of his face. Kemper believed that No. 4 looked "familiar" but she was not "sure" that he was the man in the back seat who shot McDaniel because she did not remember seeing a tattoo. *Id.* at 51.

[9]     A crime technician was sent to the Emerson Knoll location around 8:30 p.m. to process the crime scene. Among other things, a red, size 9, Converse brand low-top right shoe was collected from the parking lot. The technician then went to the Colorado Avenue scene and, while there, collected a red, size 9, Converse brand low-top style left shoe.

[10]    Later that night, around midnight, Kemper went to Acquaye's apartment and the two of them discussed "[t]he whole situation and who did it." *Id*. at 52. Kemper told Acquaye that she believed that the person who shot McDaniel went by the nickname "40" because McDaniel had talked to Kemper earlier in the day about meeting and selling drugs to "40." *Id*. at 52-53. Acquaye knew "40" or "40-Cal" as the brother of one of her friends, and they looked up that person on Facebook and viewed pictures of him. *Id*. at 52-53, 62, 179. Believing that she recognized the person, Kemper called Detective Dunn, and they met days later at which time she showed him the Facebook pictures.

[11] On November 16, 2016, Detective Dunn met with Baxter, who after waiving his *Miranda* rights, agreed to a video-recorded interview, which was admitted into evidence at trial.[2] Baxter denied having been at the Emerson Knoll apartment complex on the night of September 7, 2016, and denied knowing McDaniel. Detective Dunn questioned Baxter about who shot him in the leg that night and Baxter said that someone robbed and shot him and that, after he was shot, a man gave him a ride to the Colorado Avenue location, where his family called for an ambulance. Baxter acknowledged that he owned a pair of red Chuck Taylor Converse tennis shoes but said that, on the night in question, he was wearing Jordans No. 5. Later in the interview, Baxter admitted that it was possible or probable he had been wearing red Chuck Taylors that night. When asked if his shoe had come off when he was shot in the leg, Baxter replied that he did not remember.

[12] On December 2, 2016, the State charged Defendant with Count I, murder, a felony, Count II, felony murder, Count III, Level 3 felony attempted armed robbery, and Count IV, Level 4 felony unlawful possession of a firearm by a serious violent felon. At the October 2018 jury trial, Kemper testified that, at the time that the photo array was shown to her, she was not certain of her identification of No. 4 (Baxter) because "the tattoo threw [her] off" as she "didn't remember seeing it." *Id*. at 51, 60. She further testified that, after she and Acquaye looked up "40" on Facebook later that night, she contacted

---

[2] Due to technical difficulties at trial, only the audio portion was played for the jury.

Detective Dunn to tell him she had additional information about the shooting. Acquaye identified Baxter in court as the person she saw on Facebook, and confirmed that the Facebook page she viewed was titled "SuddenDeath RaisedMe Baxter." *Id.* at 182; *State's Exhibit 5.* Evidence was presented that Baxter lived in an apartment complex that was commonly known by the street nickname of "Sudden Death." *Transcript Vol. III* at 7.

[13] Detective Dunn testified that, although Kemper did not make what he considered to be a "positive identification" from the photo array, because she was "not for sure based on tattoos," he testified that Kemper "believed person No. 4 looked like the person that was responsible for shooting Malcolm McDaniel, and she made that known to me at that time[.]" *Id.* at 225-26. Detective Dunn testified that, subsequent to their first interview, Kemper contacted him and that he met with her on September 9, when she showed him the Facebook pictures of Baxter.

[14] Detective Dunn also testified that the shoe found at the Colorado Avenue scene was "the opposite shoe to the one that was found on the scene [at Emerson Knoll]. It matched the exact same color, same shoe size. It was the other shoe." *Id.* at 231. A crime scene specialist for the Marion County Crime Lab confirmed that the shoes collected from both crime scenes were the "[s]ame brand, same style, same color and same shoe size." *Id.* at 99. A resident of the Emerson Knoll Apartments testified, under subpoena, that on the night in question he was in his apartment, heard gunshots, and looked out his window. He saw a "red car" in front of his apartment and, a couple of parking spots

down, he saw a purple PT Cruiser that soon drove away. *Transcript Vol. II* at 208-09. He also saw a red shoe near the passenger side door of the PT Cruiser. Baxter did not testify at trial, but his audio recorded statement with Detective Dunn was played for the jury.

[15] The jury found Baxter guilty on Count I, murder, and Count IV, possession of a handgun without a license,[3] and not guilty on Counts II and III. Baxter then admitted to being a serious violent felon following an agreement with the State that Count IV would run concurrently to Count I. After receiving evidence and argument at the November 2018 sentencing hearing, the trial court sentenced Baxter to sixty years on Count I and ten years on Count IV, to be served concurrently. Baxter now appeals.

## Discussion & Decision

## I. Sufficiency of the Evidence

[16] Baxter claims that the evidence was insufficient to support his conviction for murder. When reviewing the sufficiency of the evidence supporting a conviction, we must affirm if the probative evidence and reasonable inferences drawn from the evidence could have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt. *Abd v. State*, 121 N.E.3d 624, 629 (Ind. Ct. App. 2019), *trans. denied*. "It is not our job to reweigh the

---

[3] The trial was bifurcated for the purposes of Count IV, unlawful possession of a firearm by a serious violent felon. In the first stage of trial the jury was asked only to decide if Baxter possessed a handgun.

evidence or to judge the credibility of the witnesses, and we consider any conflicting evidence most favorably to the trial court's ruling." *Id*. We will affirm the convictions if there is sufficient probative evidence from which a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *Dickenson v. State*, 835 N.E.2d 542, 552 (Ind. Ct. App. 2005), *trans. denied*.

[17] To convict Baxter of murder as charged, the State was required to prove that he knowingly or intentionally killed McDaniel. *See* Ind. Code 35-41-1-1(1). Baxter contends on appeal that the evidence was insufficient to prove that he was the person who murdered McDaniel. Specifically, he argues that Kemper was the sole eyewitness and that she was not able to positively identify Baxter in the photo array, telling police that she did not recall seeing a facial tattoo. He further notes that Kemper told police that she recalled the shooter was wearing shorts, when he was wearing dark jeans that night. Baxter also highlights that no physical evidence recovered from the Emerson Knoll scene tied Baxter to that location. He maintains that, on the record presented, "a reasonable jury could not have found that . . . Baxter was the person who shot and killed McDaniel." *Appellant's Brief* at 19. We disagree.

[18] It is well-settled that "[a] judgment may be sustained based on circumstantial evidence alone if that circumstantial evidence supports a reasonable inference of guilt." *Davis v. State*, 791 N.E.2d 266, 270 (Ind. Ct. App. 2003) (citing *Maul v. State*, 731 N.E.2d 438, 439 (Ind. 2000)), *trans. denied*. Here, there was ample

circumstantial evidence presented from which the jury could have inferred that Baxter was the person who shot and killed McDaniel.

[19] When Kemper told Acquaye that she believed the man who shot McDaniel went by the name "40," Acquaye showed Kemper the Facebook page for "40-Cal," and Kemper recognized him and contacted Detective Dunn. The Facebook page was titled "SuddenDeath RaisedMe Baxter" and thus connected the name "40" to Baxter, who lived in an apartment complex known by the street nickname of "Sudden Death." *Transcript Vol. II* at 182. As for Kemper not recalling facial tattoos on the shooter, she was in the front seat and facing McDaniel, not looking at the shooter in the back seat. Additionally, Baxter was seated behind McDaniel and, to the extent that Kemper turned toward the back seat or saw Baxter, she may only have seen the right side of Baxter's face which had only a small tattoo, with the larger one above his left eyebrow.

[20] Kemper testified that, after the backseat passenger shot at McDaniel, McDaniel returned fire, at which time the shooter exited the vehicle and ran. Minutes after McDaniel was shot, Baxter was found approximately a mile away on Colorado Avenue, having been shot in the leg. Baxter was wearing one red Chuck Taylor Converse low-top tennis shoe on his left foot, and no shoe on his right foot. A red Chuck Taylor Converse low-top shoe, for a right foot, was found at the Emerson Knoll scene. Baxter could not explain to police who shot him or where it happened. When interviewed at a later time, Baxter said that he was robbed and shot by an unknown person while riding in a car. He

admitted to Detective Dunn that he owned red Chuck Taylor shoes and that he might have been wearing them that night.

[21] Baxter's claim that the State presented insufficient evidence is merely a request to reweigh the evidence, which we cannot do. *See Abd*, 121 N.E.3d at 629. The State presented sufficient evidence from which the jury could have reasonably inferred that Baxter was the person who shot and killed McDaniel.

## II. Sentencing

[22] Baxter contends that his sixty-year murder sentence is inappropriate. We may revise a sentence authorized by statute if, after due consideration of the trial court's decision, we find the sentence inappropriate in light of the nature of the offense and the character of the offender. Ind. Appellate Rule 7(B). Indiana's flexible sentencing scheme allows trial courts to tailor an appropriate sentence to the circumstances presented and the trial court's judgment "should receive considerable deference." *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008). The principal role of appellate review is to attempt to "leaven the outliers." *Id*. at 1225. Whether we regard a sentence as inappropriate at the end of the day turns on "our sense of culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Id*. at 1224. Deference to the trial court "prevail[s] unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good

character)." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015). The burden is on the defendant to persuade us his sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006).

[23] When determining whether a sentence is inappropriate as to the nature of the offense, the advisory sentence is the starting point the Legislature has selected as an appropriate sentence for the crime committed. *Id.* at 1081. For his murder conviction, Baxter faced a sentencing range from forty-five to six-five years, with the advisory being fifty-five years. *See* Ind. Code § 35-50-2-3. At the sentencing hearing, the trial court found that "the criminal history is an aggravator" and ordered sixty years on the murder conviction, to be served concurrently to ten years on Count IV. *Transcript Vol. III* at 71. Baxter urges that his sentence is "inappropriately harsh" and requests that we reduce it to the advisory sentence of fifty-five years. *Appellant's Brief* at 20.

[24] As this court has recognized, "[t]he nature of the offense is found in the details and circumstances of the commission of the offense and the defendant's participation." *Croy v. State*, 953 N.E.2d 660, 664 (Ind. Ct. App. 2011). Here, Baxter, unhappy with the drugs that he received from McDaniel, began "shooting wild" in the vehicle, striking McDaniel seven times before fleeing the scene. *Transcript Vol. II* at 48. His conduct put not only McDaniel's life in danger, but also Kemper's and that of residents of the apartment complex, with at least one bullet lodging in an apartment wall. Baxter has not persuaded us that the nature of the offense warrants revision of his sentence.

[25]     "The character of the offender is found in what we learn of the offender's life and conduct." *Croy*, 953 N.E.2d at 664. When considering the character of the offender, "'one relevant fact is the defendant's criminal history,' and '[t]he significance of criminal history varies based on the gravity, nature, and number of prior offenses in relation to the current offense.'" *Sanders v. State*, 71 N.E.3d 839, 844 (Ind. Ct. App. 2017) (quoting *Garcia v. State*, 47 N.E.3d 1249, 1251 (Ind. Ct. App. 2015), *trans. denied*), *trans. denied*. The trial court may consider not only the defendant's adult criminal history but also his juvenile delinquency record in determining whether his criminal history is significant. *Id.*

[26]     Baxter, who was twenty-six at the time of sentencing, admits that he has a "substantial" criminal history. *Appellant's Brief* at 24. As a juvenile, he was arrested ten times with four true findings for misdemeanors and one true finding for a status offense, and he had violations of monitoring and probation. As an adult, he was arrested ten times, accumulating one felony conviction and three misdemeanor convictions. Baxter has had his probation revoked and he received numerous conduct violations while incarcerated in the Indiana Department of Correction (DOC). He was released from the DOC in February 2015, and in September 2016, he murdered McDaniel while purchasing illegal drugs. We do not find anything about Baxter's character that makes his sentence inappropriate.

[27]     We reiterate that our task on appeal is not to determine whether another sentence might be more appropriate; rather, the inquiry is whether the imposed sentence is inappropriate. *Barker v. State*, 994 N.E.2d 306, 315 (Ind. Ct. App.

2013), *trans. denied*. Baxter has failed to carry his burden of establishing that his sentence is inappropriate in light of the nature of the offense and his character.

[28] Judgment affirmed.

Brown, J. and Tavitas, J., concur.